## GOULD *v.* RAYMOND.

## DRAKE *v.* NORTH HAMPTON.

*Bowles* v. *Landaff* (*ante*, *p.* 164) affirmed.

ASSUMPSIT, for money paid by the plaintiffs for substitutes. Writs dated March 5, 1875. Pleas, the general issue and the statute of limitations. Facts agreed. August 29, 1864, Gould, being a citizen of the town of Raymond, and being liable to perform military duty in the service of the United States, furnished a substitute, who was mustered into that service as a part of the quota of Raymond. Gould paid for procuring the substitute $100 more than he has received from the town, state, or United States. The warrant calling the annual town-meeting of Raymond on the 14th day of March, 1865, contained this article : " To see if the town will vote to refund to each and every person (who may have provided a substitute) the $100 paid by them over and above the amount previously received from the town as paid to substitutes towards filling the quota of said town agreeable to the requisition made on said town by the president of the United States." At that meeting the town passed the vote proposed in the warrant.

Drake was a citizen of North Hampton, and the facts in his case are the same as in Gould's, except that the article in the warrant calling a town-meeting on the 13th day of March, 1866, was,— "Art. 24. To see if the town of North Hampton will vote to pay the men of said town the sums of money they can severally prove to the satisfaction of said town that they have paid out to fill the quotas of said town ;" and the town " Voted, That should it ever become legal, the selectmen are instructed to pay the sums of money to the men who have paid for filling the quotas of this town, agreeably to Art. 24 of the warrant."

At the June term, 1879, these cases were disposed of by the decision in *Bowles* v. *Landaff*, *ante*, p. 164. Judgments were ordered for the defendants; and the plaintiffs moved for a rehearing.

*Frink*, for the plaintiffs.

I. We imagine the first question in this case to be, Is the purpose of this legislation a public one ? It has already been determined that it was competent for the legislature to confer upon towns the power to offer and pay bounties for the purpose of filling up the several calls made upon the state by the president. *Spaulding* v. *Andover*, 54 N. H. 50. And it is put upon the ground that this duty is a public one, and the payment of bounties is only a necessary and reasonable way of enabling towns to fulfil this public

obligation. , The votes of the towns were founded on a good consideration; or, still stronger than that, by these votes the towns assumed a public burden which the plaintiffs had in the first instance incurred for them.    In the discussion of this class of cases, the courts have said that gratitude to the citizens who assumed this public burden of real or delegated soldiership is a sufficient consideration to support the action of the legislature.    *Brodhead* v. *Milwaukee,* 19 Wis. 652.    We prefer, however, to base it upon the more technical ground that the duty was a public one.    It concerned the common welfare of the community.    A requisition had been made upon the town, which it was obliged to fill, either by conscription of its citizens, or by raising volunteers.    To relieve the town of this burden the plaintiffs furnished substitutes.    It does not matter that by this act the individuals might have purchased personal exemption, if at the same time it was for the benefit and relief of the entire community, or of a class of the community. The case of *Brodhead* v. *Milwaukee* directly covers this point, and the language of the court, if adopted, concludes this entire question.    "So far as the public interest is concerned, I can see no distinction between paying bounties to them [*i. e.,* to those who furnished substitutes] and to those who volunteered."    In the language of Judge Black, " It is enough that we can see any possible public interest in the act, or public benefit to be derived from it."    In the case under consideration a call was pending.    It was imperative upon the town to answer it.    The duty of answering it was a public one, and the plaintiffs, by aiding the town in responding to it, assumed this public duty and "relieved the town the same as if they had enlisted."

No question or suggestion has ever been made in any case in this state that it was not as lawful for the legislature to authorize payment of bounties to those furnishing substitutes as to those enlisting.    *Upton* v. *Stoddard,* 47 N. H. 170, 171.    And neither congress nor the legislature have ever recognized any distinction in the service rendered to the public by the one or the other.    If the substitutes had been furnished when no call was pending which imposed upon the town the burden of filling it, or if these substitutes had been furnished in excess of the number required of the town, or if the plaintiffs had paid commutation-money without rendering any service either in person or by substitute, then their action might well be said to be entirely personal.    But this was not the case.    Can it be said, in the light of contemporaneous history, that these men rendered no public service by their acts? The one great fear of the general government and of our state and towns was, that the army would have to be recruited by conscription.    The conduct of such men as the plaintiffs averted that calamity.    The benefit to the community in not depleting it of its best citizens, in averting the odium of a draft, and the difference between voluntary service and involuntary servitude, are but a few

of the public benefits arising from the conduct of this class of men. We know that the court, in *Freeland* v. *Hastings*, 10 Allen 570, apparently came to a different conclusion from the one we are now urging.   But with all due deference, we submit that the distinction the court there attempts to make between the cases (considered as regards public benefits) of those who contributed money to a public fund to furnish substitutes, and those who furnished substitutes individually, is very artificial, and that the distinction is ill-founded. It is entirely in conflict with the reasoning of the court in *Brodhead* v. *Milwaukee*.   There is this distinction to be observed between the case in Massachusetts and the one we are now considering, which is a very important one.   The parties there claiming the benefit of the vote seem to have furnished substitutes in anticipation of a call, and for the sole purpose of their own protection. Here it was done to relieve the town of the burden of filling its quota and of the odium of a draft, in compliance with a requisition made upon it.   The whole tendency of our legislation has been to make the filling of our quotas a public and not a private burden.

If, then, the act of furnishing a substitute was a public one, or in any degree promotive of the public welfare, we take it that the objection, that the act of 1874 ratifies a past expenditure, is not tenable.   We submit if it was competent for the legislature to authorize the payment of money to those furnishing substitutes, so it is competent for them to sanction an expenditure already made for a like object.   *Freeland* v. *Hastings*, 10 Allen 587.   To make a tax law unconstitutional on this ground, it must be apparent at first blush that the community taxed can have no possible interest in the purpose to which the money is to be applied.   *Booth* v. *Woodbury*, 32 Conn. 128.

II. The act is not opposed to any direct provision of our constitution.   The defendants are not in a position to claim that it is either injurious, oppressive, or unjust.   To them it is simply an enabling act, aiding them in the execution of their own votes. Retrospective legislation, which impairs vested rights and imposes involuntary obligations "for the benefit of another to whom the first owed no duty and was under no obligation," would be within the prohibition of our bill of rights.   *Towle* v. *Eastern R. R.*, 18 N. H. 550.   This contract being one which the legislature originally might have authorized, is not open to the charge of being unconstitutional.   Cooley Const. Lim. 379.

We submit, then, these several propositions:

1. That the duty of raising soldiers for the common defence is a public one.

2. That the plaintiffs, in relieving the town of this burden, contributed to this public object.

3. That the circumstances under which the advancements were made were such as to challenge the public gratitude.

4. That the act of the legislature ratifying the votes of the town

sanctions an expenditure made for a public purpose, and is neither injurious, oppressive, nor unjust.

III. If the court should entertain the view we do, that the act of 1874 is constitutional, we suppose the rights acquired by it cannot be impaired by subsequent legislation. The rights accruing to these plaintiffs under that act were not affected by its repeal. Gen. St., *c.* 1, *s.* 34; *Spaulding* v. *Andover*, 54 N. H. 56.

IV. The cause of action did not accrue until the act of the legislature in 1874, so it is not barred by the statute of limitations. *Sawyer* v. *Tappan*, 14 N. H. 358; *Hall* v. *Thayer*, 12 Met. 130; 3 Parsons Cont. 90; Gen. St.. *c.* 202, *s.* 3. The statute does not attach itself to the contract; it affects the remedy only, and the remedy could not have been pursued until the action of the legislature. *Paine* v. *Drew*, 44 N. H. 306. " Where congress gives to a party the right to sue where he could not sue before, the statute of limitations will begin to run only from the date of the act." *Cross's Case*, 4 Ct. of Cl. 271.

*Hatch*, for the defendants.

I. At the date of the votes named in the case, the towns had no power to appropriate money for the purposes indicated therein. *Crowell* v. *Hopkinton*, 45 N. H. 9; *Stone* v. *Danbury*, 46 N. H. 140.

II. If the plaintiffs can maintain their actions, it can be only by force of the act of July 7, 1874, Laws, *p.* 314. But, so far as the statute applied to votes of towns theretofore passed, it was retrospective, unconstitutional, and void. Const. of N. H., Bill of Rights, Art. 23. The statute attempts to impose upon towns a debt or duty which did not exist before its passage. *Towle* v. *Eastern Railroad*, 18 N. H. 547; *Willard* v. *Harvey*, 24 N. H. 351; *Dow* v. *Norris*, 4 N. H. 16; *Soc. for Prop. of the Gospel* v. *Wheeler*, 2 Gall. 139; *Kennett's Pet.*, 24 N. H. 140; *Bristol* v. *New Chester*, 3 N. H. 535; Cooley Const. Lim. 369. It is not material if a moral obligation existed before the enactment of the statute. A debt barred by the statute of limitations cannot be revived by a repeal or change of the law. *Woart* v. *Winnick*, 3 N. H. 473; *Rockport* v. *Walden*, 54 N. H. 167. A statute cannot authorize a divorce for matters already past. *Clark* v. *Clark*, 10 N. H. 380; *Greenlaw* v. *Greenlaw*, 12 N. H. 200. The legislature cannot grant a new trial. *Merrill* v. *Sherburne*, 1 N. H. 199.

In the present case the statute proposes to give force to a vote or promise, which was not only without authority, but without consideration. The plaintiffs did nothing and paid nothing for their towns; and if they did, it was not at their request, and the consideration was past at the date of the votes. Chitty Contracts 52; *Hatch* v. *Purcell*, 21 N. H. 544. The legislature might as well enact that every *nude pact* or promise, without consideration heretofore made, shall be binding. The military service required was

a matter purely personal to the plaintiffs, and the towns, as corporations, had no more interest in it than the county, school-districts, or any other corporations. The action is founded on contract; but if there be any valid contract, it is a contract created by the statute for the parties—" a thing quite beyond the power of legislation." Cooley Const. Lim. 369; *Medford* v. *Learned*, 16 Mass. 215.

III. The statute was repealed July 3, 1875. Laws, *c.* 21, *p.* 452. If the legislature could create in favor of the plaintiffs a right of action against the defendants, they could take it away, and might even compel the plaintiffs to restore the money after they had obtained it by suit. This action can be maintained only by force of the act of 1874, and that statute is gone.

The 34th section of *c.* 1 of the Gen. St. is a law subject to repeal, or to exception by any subsequent statute. The act of July 3, 1875, which repealed the statute of July 7, 1874 (Laws, *p.* 314), must be understood to intend the abrogation of the last named statute as entirely as if it had never existed, and it has that effect. Otherwise some towns remain bound by votes passed before the act of 1874, others by votes passed since, others perhaps not at all. Persons who have commenced suits may be entitled to indefinite sums of money, which other persons similarly situated cannot recover; and, on the part of towns, the right to vote reimbursements to their citizens "accrued" was established and became perfect by the act of 1874. The repealing act produces nothing but confusion, unless it be construed to be a radical repeal. So the legislature plainly intended. *People* v. *Commissioners*, 47 N. Y. 501; *People* v. *Supervisors*, 67 N. Y. 109; *Christ Church* v. *Philadelphia*, 24 How. 300.

IV. If the votes of the defendant towns can in any manner be construed to give the plaintiffs the right of action, that right is barred by the statute of limitations; and this bar the legislature cannot remove. It seems absurd to say that the legislature may create a right of action upon a cause already barred. If they can do this they may do the lesser thing,—*i. e.*, give to the proprietor of a just claim that is barred a fresh right of action upon it.

*Jeremiah Smith* and *Frink*, for the plaintiffs, on motion for rehearing.

Could the legislature have previously authorized the towns to pass the votes? For the purposes of this argument we may safely concede that the United States conscription acts did not impose any duty upon New Hampshire towns, and that the several states were under no imperative obligation to assist the general government in carrying out these laws. But it by no means follows that the states could not, of their own motion, aid the United States in this respect, nor that the states could not, in the rendition of such voluntary aid, impose duties upon or grant powers to municipalities within their limits.

Two propositions seem undeniable:—First. The state could voluntarily aid the general government in procuring United States soldiers and commutation-money from the inhabitants of the state. Such aid is not excluded by the act of congress.  On the contrary, the United States act of February 24, 1864, "was framed with direct reference to such state and municipal aid; and the act of congress and the act of the state, without the slightest repugnance or opposition, [may] go hand in hand together for the more ready and perfect accomplishment of one common object."  "The propriety and legality of such assistance are expressly recognized in the third proviso of the seventh section, and the second proviso of the twentieth section of the act of congress," providing for the deduction or repayment, in certain cases of bounties, from the state or from local authorities.  *Agnew, J.*, in *Speer* v. *School Directors of Blairsville,* 50 Pa. St. 150, 166; *Dixon, C. J.*, in *Brodhead* v. *Milwaukee,* 19 Wis. 624, 662, 663; *Elmer, J.*, in *State* v. *Collector,* 2 Vroom 189, 195, 196; *Butler, J.*, in *Booth* v. *Town of Woodbury,* 32 Conn. 118. Second. In furtherance of these objects the state could take any measures which it might have adopted to raise state troops to be immediately turned over to the United States service, or to raise troops for purely state service.  There is no constitutional restriction on the power of the state in these respects, and the legislature may exercise whatever power the state possesses.

If the legislature could have taken action in aid of these objects, why may they not authorize towns to do so?  The objection raised is the alleged constitutional maxim that "legislative power cannot be delegated to towns except for local purposes."  What are "local purposes" within the meaning of this maxim?  The term "local purposes" must at least be broad enough to include all those purposes which were universally considered proper subjects of local action at the time of the formation of the constitution. The application of this test is decisive in the plaintiff's favor. The first (extended) constitution was framed in 1783, just at the close of the Revolutionary war.  During the entire period of that war it was the general practice of New Hampshire towns to vote town bounties to soldiers in the continental army (as well as to the militia).  These town bounties were entirely distinct from and additional to the continental and state bounties.  As to the amount of the continental and state bounties, see 8 Bouton's State Papers 393, note 1, 843.  As to the practice of New Hampshire towns in the Revolutionary war to vote and pay town bounties, which were distinct from and additional to continental and state bounties, see Dover Records, book 9, votes of September 10, 1777, July 4, 1780, July 14, 1781, September 19, 1781; Somersworth Records; Rochester Records; History of Dublin 21; History of Hollis 170, 180, 181, 182, 183, 190, 193, 196; History of Chester in vol. 7, N. H. Hist. Coll. 369 (and see History of Concord 276, 278, 279); Letter of Col. Enoch Hale, of Rindge, to committee of safety, found in

8 Bouton's State Papers 543,—" * * * our Towns generally give one hundered dollars to a man, and offer to give it   *   *   *;" History of Boscawen 117, 120, 252; Cogswell's History of Nottingham, Deerfield, and Northwood (as to Nottingham, 128, 129; as to Deerfield, 292, 293; as to Northwood, 527); History of Gilmanton 88, 93, 94, 95, 96; Historical Sketch of Croydon, in vol. 6, N. H. Hist. Coll. 218; Sketch of Sanbornton, votes of 1780, 1781, in 3 Farmer & Moore's Hist. Coll. 354; Barrington Town Records, book 2, *p.* 145, vote of November 18, 1776; *p.* 148, vote of April 15, 1777; *p.* 149, vote of June 16, 1777; Durham Records, book 1, *pp.* 111, 112, 137, 138, 145, 171; Com. of Safety Records, May 1, 1777, 7 N. H. Hist. Coll. 93; Dover Records, book 9, *pp.* 153, 156, 164, 165, 168, 169, 172, 173, 174, 175, 178, 179; Madbury Records, votes of August 12, 1776, April 12, 1777, September 15, 1777, April 21, 1778.

Perhaps it will be said that these town votes were passed under the supposition that the raising of troops was included under the term "other necessary charges" in the general statute authorizing towns to raise money, and that such a construction of that statute has since been held erroneous. But this (if it be so) does not affect our argument. The question here is, not whether the people of that day were right in supposing that the legislature had authorized towns to vote bounties, but whether they universally understood that the subject was one upon which the legislature could authorize towns to act. If there was such an understanding, the constitution is to be construed in the light of it.

But these town votes were not without legislative recognition. On the contrary, they were impliedly assented to by that body, as well as by the executive authorities of the state. The statute of November 26, 1777, Laws (ed. 1780) 96, contains a proviso that town committees for the supply of necessaries to soldiers' families "shall refrain from supplying the Families of such men as have received Bounties (either from the Town for which they enlisted, or from Individuals in Consideration of their entering into the Continental Army) for so long a time as the said Committee shall judge the Bounties they respectively received would have answered the extra Expense of supplying their respective Families with Necessaries." March 20, 1777, President Weare issued the following order to Gen. Folsom : "Pursuant to a Resolve of the Council and Assembly for raising and completing the three Regiments allotted to this State as their proportion of the Continental army to be raised for three years or during the war; You are hereby directed to Issue order to the several Colonels under your command   *   *   *   *  to give orders   *   *   *   *   and for the Captains to call on the Selectmen of their respective Towns and Parishes (by calling Town or Parish meetings) to assist them in speedily procuring their men   *   *   *   *."   8 State Papers 512.   May 1, 1777, the committee of safety issued a decision, containing the fol-

lowing recital: "Whereas it has been represented that many Towns in this State, Notwithstanding their unwearied endeavours and offers of large Bounties, have not yet been able to procure their full Quotas of Men for the Continental Service ; Therefore   *   *   *   *." 7 N. H. Hist. Coll. 93. By the statute of March 16, 1780, unimproved lands of non-residents were assessable by selectmen for "*   *   *   * the charges of hiring soldiers to enlist in the service of this state, or of the United States ;   *   *   *   *."

Moreover, other legislative enactments of unquestioned validity involve the existence of the power in dispute. The legislature imposed upon towns the duty of raising soldiers and providing arms and ammunitions. The power to authorize towns to raise and appropriate money for these purposes "is necessarily included within the larger power" by virtue of which the duty of raising and arming troops may be imposed upon the several towns. *Freeland v. Hastings*, 10 Allen 570, 581. As to the duties imposed upon towns and their officers during the Revolutionary war, see act of March 18, 1780; act of September 19, 1776, *ss.* 6, 18, 19, 21; acts of January 18, 1777; vote of April 26, 1775; 7 Prov. Papers 462; 7 Prov. Papers 461, 476, 484. By a recital in the act of April 7, 1781, it appears that the act of January 12, 1781 (not found among the printed statutes), imposed penalties on towns failing to procure their proportion of "this State's Quota of the Continental Army." See 7 N. H. Hist. Coll. 328, 329.

In Massachusetts, by an act passed in 1777, *c.* 41, it was provided that towns at any legal meeting might vote money "for the encouragement of men to engage in the army," to be assessed on the inhabitants of towns according to the rules and methods prescribed by law for apportioning the state tax; and it was further enacted, that all grants and assessments which had been voted in times past for such purposes should also be deemed and taken to be legal and valid. See *Freeland v. Hastings*, 10 Allen 570, 582. The legislative power to authorize such votes was assumed as undoubted in *Stetson v. Kempton*, 13 Mass. 272, 284. In Rhode Island in 1777 it was enacted "that each town be empowered to give such a sum, over and above the bounties already allowed, as they can agree for with the men enlisting, not exceeding the sum of $22, lawful money; that exact accounts be kept of the moneys which shall be expended by each town, as aforesaid, which shall be refunded to them out of the general treasury; and that no further sum be given as a bounty by any town, either in behalf of the state, or at their own expense;" and that every town deficient in raising its proportion of men "shall pay as a fine to, and for the use of, this state, £10 for every soldier they shall be deficient in.   *   *   *" 8 R. I. Colonial Records 200–202. As to Connecticut, see *Hitchcock v. Litchfield*, 1 Root 206.

The above citations from town histories, records, and statutes make it clear that the voting of town aid in raising continental

soldiers was then deemed one of the subjects on which towns could be empowered to act. The constitution contains no prohibition against the grant or exercise of similar powers in future. Nor can the intention to imply such a prohibition be inferred from the circumstances under which the constitution was adopted. That instrument was not framed for the purpose of erecting a barrier against municipal encroachment upon the proper sphere of state sovereignty. Our ancestors were not exercised by the fear that towns would usurp legislative functions. They were content to leave the subject of the proper sphere of municipal action to be determined in accordance with the usages then prevailing.

No sound distinction can be drawn between rendering aid in the Revolutionary war and rendering aid in the recent civil war. Both wars were national. Whatever might be done to create the Union, might be done to preserve it. In both wars the state could assist the national authority. And, in rendering such assistance, the state could do anything which it might do in raising troops for a purely state purpose. If the state could authorize towns to do certain acts in assisting to raise state troops, it could authorize them to do the same acts in assisting to raise national troops. Certainly, if the state could authorize towns to aid in raising state troops, which were to be immediately turned over to (and mustered into) the U. S. army, the state could also authorize towns to aid in raising troops directly for the U. S. army. The difference is one of form.

The statutes authorizing towns to vote bounties in aid of the U. S. conscription acts were not rendered unconstitutional by the omission of the legislature to prefix a preamble declaring it to be the corporate duty of towns to aid in accomplishing the purposes of these acts, or by the omission to impose a fine of one cent upon towns in case of non-fulfilment of this duty. The very grant of authority to towns to aid in this work is an implied recognition of their duty, quite as effectual as the *brutum fulmen* of a formal declaration, or the imposition of a nominal penalty. See, also, statute of July 16th, 1864, P. L., c. 2868.

There is "no valid distinction in principle between a right to raise money for a specific object yet to be accomplished, and a right to raise money to defray the expense of the same object after it has been attained." If the town could have been authorized to make an appropriation to pay the United States the commutation-money due from drafted men, then the town can be authorized to make an appropriation to reimburse persons who have paid commutation-money.

An appropriation of money to pay commutation is an appropriation for a public use, and the right to appropriate for this purpose (or to pay bounties to substitutes) stands on the same ground as the right to pay bounties to volunteers. The general government, in effect, made an alternative call on the citizens of each sub-district. If, for instance, the quota was one, the call was, in sub-

stance, for one soldier, or for three hundred dollars, to be used by the government in procuring a soldier elsewhere ("for the procuration of such substitute;" U. S. Act of March 3, 1863, s. 13). Furnishing a soldier, and furnishing money with which to procure a soldier, stood on the same ground. Either act was the rendition of a public service, and none the less so because it operated at the same time as a relief to a private individual.

In addition to the foregoing "argument from history," the plaintiffs rely on the long list of decisions holding municipal bounty votes valid on grounds other than the above. Cooley Const. Lim. 221–225. That the legislature, possessing power to raise money for this purpose, may delegate that power to local sub-divisions of the state, has been regarded as very clear. See *Butler, J.,* in *Booth* v. *Woodbury,* 32 Conn. 118; *White, J.,* in *Cass Township* v. *Dillon,* 16 Ohio State 38, 52; *Comer* v. *Folsom,* 13 Minn. 219; *Winchester* v. *Corinna,* 55 Me. 17.

Supposing that the legislature could have authorized the town to pass the vote, can the legislature validate the vote by their subsequent ratification? The legislature may ratify a vote if they could have previously authorized it. This is the doctrine laid down by recent text-writers of the highest authority. Cooley Const. Lim. (2d ed.) 379; Dillon Mun. Corp. (2d ed.), s. 424, note; 387 note, and 46. And see *Winchester* v. *Corinna,* 55 Me. 9, where the legislature ratified a vote which was originally passed, not only without authority, but in the face of an express statutory prohibition.

In opposition to this view, a line of argument has been adopted which affords a striking instance of "begging the question." It is assumed that the vote was "absolutely void," and upon this assumption it is argued that the passage of the ratifying statute is simply an attempt to "compel" the town to assume a burden. We concede that if the premise is admitted, the conclusion follows. But this reasoning assumes the very question in issue, viz., whether the vote was absolutely void in the broadest sense of that term. "There is in our books great looseness and no little confusion in the use of the terms void and voidable, growing, perhaps, in some degree, out of the imperfection of our language. There are at least four kinds of defects which are included under these expressions, while we have but those two terms to express them all. * * * I. Proceedings may be wholly void, without force or effect as to all persons and for all purposes, and incapable of being or being made otherwise. This is the broadest sense of the word, but the cases which fall within this signification are probably not numerous. * * * II. Things may be void * * * until they are confirmed; but though said to be void, they are not so in the broadest sense of that term, because they have a capacity of being confirmed, and after such confirmation they are binding. For this kind of defect our language affords no distinctive term." *State* v. *Richmond,* 26 N. H. 232, 237, 238. See, also, 1 Pars. Con. (4th ed.) 275, note *l.*

To say that an act is incapable of confirmation because it has no legal validity before confirmation, amounts to prohibiting confirmation of an originally invalid act in any case whatever—a doctrine which would work a legal revolution. An act may be invalid for one purpose, and yet valid and effectual for other purposes. Thus, the original vote did not, alone and of itself, constitute an enforceable town obligation; but it was effectual for the purpose of furnishing to the legislature an expression of the willingness of the town to assume such an obligation, with the legislative assent. The legislature do not "compel" the town to assume a liability. They merely waive all objection on the part of the state to past action of the town. In other words, they grant a request instead of issuing a command.

It may be urged that the vote cannot be regarded as an expression of the wishes of the town, because citizens may have refrained from voting, knowing that the town had then no authority to act upon the subject, and therefore treating the vote as an idle ceremony. The vote was not beyond municipal jurisdiction, like a vote to inflict capital punishment upon the selectmen, or to give all the municipal property to some favorite citizen, which could not be previously authorized by the legislature, and would be void in the broad sense of being insusceptible of confirmation. A vote to repay commutation-money is within the possible sphere of municipal action; it is within the range of subjects upon which the legislature can authorize towns to act. The citizens may be regarded as acting in view of the contingency of future legislative confirmation.

The phrase "municipal jurisdiction" is objectionable, because suggestive of a false analogy. Jurisdiction, strictly speaking, signifies the power to decide a controversy between two third persons. If a judge makes a decree on a subject without his jurisdiction, the legislature cannot validate his judgment. To do so would be an assumption of judicial power, to say nothing of the interference with vested rights of third persons. But municipal corporations are agencies of the state, and the ratification by a principal of the act of an agent does not involve any assumption of judicial power.

Powers may be granted or agencies created, first, with a view, chiefly, to the benefits to be derived by the grantor from the exercise of the power; or, second, with a view chiefly to the benefits to be derived by the grantee; or, third, with a view to the mutual benefit of both grantor and grantee. The relation of principal and agent between private individuals furnishes an example of the first class. The grant of power to private corporations often affords an instance of the second class. The powers conferred by the legislature upon towns are an example of the third class. The duties confided to towns are primarily incumbent upon the state, and it is for the interest of both the town and the state that these duties should be faithfully performed. In the first and second classes of

powers, if the grantee does an act in excess of the power granted, it is the general rule that a subsequent ratification by the grantor is equivalent to a prior authority from him.  In the first class, if the grantor thinks the act will redound to his benefit, he may adopt it. In the second class, if he thinks the act for the agent's benefit, he may waive all objections on his part.  If this is the rule, alike when the power is granted to be exercised for the benefit of the grantor, and when it is granted to be exercised for the benefit of the grantee, why not when it is granted to be exercised for the mutual benefit of grantor and grantee?  If this is the rule when power is granted for the benefit of either, why not when it is granted for the benefit of both?  It is presumable that the legislature will not ratify except when of the opinion that the act was a benefit to the state, or to the town, or to both.  And on the question whether it is a benefit to either, the opinion of the legislature must be final.

The denial of this power of ratification might work serious injury by preventing prompt action on the part of local agencies in moments of extreme public peril.  There may be emergencies for which the laws, " made for ordinary occasions and the usual exigencies of society," fail to provide.  There may be occasions in which the necessity of the case demands prompt and speedy action by the town, and where great harm may ensue, unless the town assume the risk of exercising powers which the legislature would have assuredly confided to them if the emergency could have been foreseen, trusting that whatever they may have honestly done for the public good will be ratified by the body which might have authorized it.  The legislature may not be in session.  There may not be time to await an appeal to that body for special powers.  Under such circumstances, " it seems to be plainly within the competence of the legislature, which could have authorized by antecedent legislation " the action of the town, to adopt and ratify such action.

The legislative power of ratification is not confined to cases where the circumstances are such that the town is estopped to deny the validity of the vote.  To confine the power within such bounds is to say that the legislature may act only in cases where their action is of no consequence; that they may ratify what does not need ratifying.

Nor can the legislative power of ratification be confined to those cases where the court can see that the obligation thus made enforceable rests on some especially equitable consideration.  No halfway ground can be logically taken.  The legislature can either validate all votes which they could have previously authorized, or none.  The expediency of ratification in each case is a purely legislative question, with which the court have nothing to do. Whether the circumstances of the particular case are such as to make it expedient to apply the remedy of ratification " is a question which must in each case involve matter of policy and discretion, fit

for debate and decision in the legislature which would have had jurisdiction to deal with the subject-matter by preliminary legislation, and as to which a court of law is not commissioned to inquire or adjudicate."

DOE, C. J.   Against the former decision of these cases an argument is advanced upon ante-constitutional precedents.   The New Hampshire government of 1776 carried on the war against foreign and domestic enemies without a bill of rights, and without any constitutional division or limitation of power.   It was a temporary sovereignty, set up " to continue during the present      *      *      * contest with Great Britain."   8 N. H. State Papers 2.   And its undefined and boundless authority, hastily assumed and arbitrarily exercised, for the transient purpose of the war, does not prove the bounds of the limited government afterwards instituted with deliberation, in a form designed to be permanent, designed in its limitations to be a radical innovation, and designed by its limitations to change the provisional and preliminary form because the latter was ₒ unlimited.   The absolute form, and its precedents so far as they were of the same character, or in any respect repugnant to the new and constitutional system, were swept away together.   8 N. H. State Papers 14–17, 420–425; 9 N. H. State Papers 878, 879.

The resolution of the provincial congress formally establishing the provisional government, contained an assertion of natural rights, constitutional in the English sense; and violations of them were alleged as public grievances and causes of the revolt.   But in that war, as in others, civil and foreign, many fundamental principles were temporarily superseded by what was regarded as necessity. Construed in accordance with the tyrannical practice of that period, the constitution would be a repeal of its own express reservations of liberty and equality.   That practice included arrest and imprisonment at the discretion of a committee of safety, banishment and confiscation without trial, and any other act of despotism that was deemed expedient.   Instead of being safe guides in the legal construction of constitutional restrictions, the precedents of that time show to what anomalous courses, in the absence of such restrictions, men can be driven by the stress of a revolution.

All power, civil and military, including the power of delegating all power, was concentrated in the two bodies composing the general court (sometimes called the general assembly), and was used as it would be likely to be by energetic men, engaged in a desperate enterprise, to the success of which everything was pledged. When they used their consolidated power; military, civil, executive, judicial, legislative, and indeterminate, when they divided it and delegated a portion of it by a revocable license, and when they delegated the whole of it undivided, they acted for their constituents upon the natural law and supreme right of self-defence.   They were elected, not to administer a constitutional government, but to

contend for the privilege of constructing such a government in the future, when time should be found for work of that kind. Meanwhile they were to take charge of the public welfare, and maintain order by such temporary measures as might be convenient.

Their methods are fairly exhibited in the proceedings of one day. In the forenoon of July 5, 1776, they choose a committee "to examine into the matter of" the complaint "of the committee of safety of Stratham against Capt. George March, as a person being inimical to the liberties of this country." The committee report that "they are of opinion that said March is inimical to his country, and that he ought to be taken care of." The house vote that Major Bass "be appointed paymaster to the second regiment" "destined for Canada." The council and house pass an act establishing courts of law for the administration of justice, in the place of those established and holden "under the former government." The house send up to the council for concurrence a resolution that the courts be "prohibited from trying any civil actions until the next session of the assembly, and that they proceed as usual to hear and try all capital crimes, misdemeanors, trovers, trespasses, assaults, batteries, robberies, thefts, and other breaches of the peace," and that the fees to be taxed in the courts be according to the last table of fees, until otherwise ordered by the general assembly. The house vote that the constable of Exeter "seize the body of George March and safely keep him till called for by this house, to be examined and tried on suspicion of being inimical to the liberties of this country, and that the clerk make out a warrant accordingly, and send out summons for witnesses by Major Barker." By concurrent votes the council and house appoint a maritime officer, two notaries public, a justice of the common pleas for Rockingham, and a special justice of the same court. In the afternoon "The council and house taking into consideration the accusations laid against Capt. George March of Stratham, as being inimical to the liberties of this country, and a full hearing being had thereon before both houses, and sundry witnesses being sworn and examined:—It appears to this court that the said George March has uttered many words against the liberties and privileges of this country: It is therefore voted and resolved, that the said George March confine himself to the limits of the farm which he now improves in Stratham, on pain of imprisonment; and that he recognize" in the sum of one hundred pounds, with two sureties, for his good behavior, "until further order of this court; and that, in the meantime, he be disarmed by the committee of Stratham." The last act of the day is a vote of the council and house, appointing Meshech Weare and fourteen others "a committee of safety for this colony, to transact all the business of both houses in the recess of the general court;" and making any eight members of the committee "a quorum to do business."

Men invested with absolute power, able to convey the whole of it to any eight members of a committee of safety, and as able to

assign it all to one man as to fifteen or eight, found no difficulty in conveying a part of it to judicial courts. And they would have found no difficulty in conveying to towns a power of paying bounties for enlistments, if it had been understood that towns needed any other authority than the law of nature for thus promoting the common cause, the failure of which would expose nearly all the voters to the penalties of treason. Such municipal power, if its source was thought of, and if it was not considered original and inherent, must have been understood to be derived from the genral court's authority to delegate, not a mere power of local legislation to towns, but all power to anybody. If the plaintiffs' argument were sound, it would reëstablish the unbounded rule that was cast off at the inauguration of free government nearly a hundred years ago. The revolutionary evidence does not show that in voting bounties for enlistments in the continental service,. a town was understood to legislate upon the subject of American independence as a local, municipal affair. Towns could vote those bounties, because, against the public enemy, anybody could do anything permitted by the general court or the committee of safety.

When, by Article 90, former laws were continued in force, such parts thereof were excepted as were repugnant to the rights and liberties contained in the constitution. Lest this exception should annul the confiscation act of November 28, 1778, and restore confiscated property, a proviso was added to save the revolutionary law on that subject. "The whole estate, real and personal," of certain tory refugees, except articles of their personal estate deemed necessary for the use and support of their families, having been seized and appropriated to the payment of public expenses, without any pretence of taxation, that proceeding was sustained, in 1784, by a special constitutional proviso. Whether the proviso was necessary or not to justify past action and sustain existing titles, it did not comprehend any other laws than those "already made respecting the persons or estates of absentees." It did not authorize future confiscation by an unequal division of public expense, which, like the revolutionary sequestration, would not be taxation. But if property could now be unequally taken for public use, under a pretence of taxation, it could be taken by a law as unequal as the confiscation act of 1778, without any such saving clause as took that act out of constitutional condemnation. As by that act the titles of John Wentworth and twenty-seven others named in the act were transferred to the state, so now, if taxation can be an unequal division of public expense, a tax law can appropriate to the payment of such expense the whole estate, real and personal, of persons singled out and named in the law. And the construction that employs the revolutionary precedents to divest taxation of its element of apportionment, and put an end to the constitutional equality of tax-payers, finds in the proscription of tories abundant war-

rant for setting at naught all constitutional security of property, liberty, and life.

And the earlier provincial practice is as inconclusive as that of the Revolution. We had no inviolable rights, no rights constitutional in the American sense, before the second day of June, 1784. The constitution that went into operation on that day terminated the era of unlimited power, and introduced an era of liberty and equality secured by a supreme written law, and an organic division of government into three branches, each invested with limited authority. And while many words and phrases of the constitution are to be taken in the sense in which they were used before 1784, the plain, written reservations of equal rights are not struck out of the document by ante-constitutional precedents of absolutism and inequality. The conflict of such reservations and such precedents is conclusive proof that the latter can be legally followed no more. The non-constitutional system was intentionally abolished, and the system of reserved rights and limited government was intentionally adopted.

The reservations could not be more clearly expressed. If the right of equality is not secured by them, it can never be secured by any written instrument. And equality that can be legally violated is not constitutionally protected. The legal value of the reservations is in their ability, not to suggest or advocate a theory of human rights, but to carry a theory into practical effect, and insure the enjoyment of the rights reserved. The want of a bill of rights was one of the defects complained of by some who protested against the organization of the government of 1776. 8 N. H. State Papers 425. In their address to the people, recommending the adoption of the constitution of 1784, the convention say,— "The bill of rights contains the essential principles of the constitution. It is the foundation on which the whole political fabric is reared, and is consequently a most important part thereof." 9 N. H. State Papers 881. And there is no more legal reason for holding its prohibition of unequal taxation, in the twelfth article, to be ineffective, than for nullifying all its articles, and the whole constitution. This prohibition is not less operative than it would have been, if, like several amendments in the nature of a bill of rights added to the federal constitution, it had been inserted, after the adoption of the original, in fulfilment of assurances without which the original might have been rejected. Story Const., *ss.* 301–305, 1858–1953; 2 Curtis Hist. Const. 508–597.

*Crowell* v. *Hopkinton*, 45 N. H. 9, and cases of that class, in which the question of equal right was not raised by counsel or considered by the court, cannot be regarded as decisive of that question.

The constitutional obligation of sharing public expense equally would not be satisfied by a declaration of a proportional but unenforceable duty, or by an imposition of a nominal fine for the nonperformance of a duty that is not nominal, or by taxation practi-

cally and substantially unequal. The right of the tax-payers of a town to contribute no more than their share of the public expense would not be a constitutional right, if the obligation of other towns to contribute their shares could be evaded by verbal ingenuity. Constitutional equality would have no meaning, if the burden of furnishing substitutes for militia-men drafted under the federal act of 1863 could be put upon some towns, and not upon all. Whether it could be put upon all, there is now no occasion to consider.

By the constitution, legislative power is vested, not in the towns, but in the senate and house of representatives. And without a well established ground of exception, the senate and house are as incapable of delegating their legislative power, as the governor and council are of delegating the power of pardon, or the court of delegating the power of deciding the constitutional question raised in these cases. All power is derived from the people, and all magistrates and officers of government are their agents, and at all times accountable to them. Bill of Rights, Art. 8. And these agents have not a general authority to avoid their official responsibility by relegating their duties to their assignees. If the legislative seats were filled with substitutes, it would not be claimed that a bill passed by them was a law. The vote of a body of substitutes, assembled in the state-house or elsewhere, is not legislation, unless authorized by a legal construction of the constitution. Government by an irresponsible master would be no more illegal than government by sub-agents not selected by the people or by their authority. Neither would be government by the people. The power of the legislature to delegate legislative power to towns in local affairs is exceptional. Cooley Const. Lim. 35, 118, 189; Cooley Taxation 51; *State* v. *Noyes*, 30 N. H. 279, 292, 293. And an unauthorized extension of the exception to non-local affairs would be abdication and usurpation. Municipal government in non-municipal affairs is not self-government.

There is no express grant of the power of delegation in local affairs, understood, as trial by jury and other technical terms were understood in 1784, in a sense shown by prior practice, or American or English history. The grant, by the people to the senate and house, of the power of delegating a power of local legislation, is implied from the principle of local self-government. But this principle does not authorize an unequal division, among New Hampshire tax-payers, of a non-local expense of raising a New Hampshire regiment for Union service in Virginia or Florida, nor impair the spirit and efficiency of the regiment by the injustice of paying some of its members nothing out of the treasuries of their towns, while others are paid considerable sums by other towns. On such subjects, we may find, in the Revolution, inequitable methods and military consequences that serve for warning, though not for constitutional example.

After July 3, 1875, when the act of 1874 was repealed, the

power in controversy was not delegated to towns.    And reimbursement having been voted by some towns before the repeal, the result is as if the repealed act had named those towns, and put upon them a burden not put upon others.    It was an act of unequal taxation.    It provided that to those who had paid money for substitutes, towns might fully reimburse such different sums as they had paid " more than they have received," without uniformity or limit of amount, and might reimburse nothing.    The operation of the act was not equalized by earlier acts empowering towns to pay limited bounties to volunteers and conscripts who served in person. Some performed their federal duty by paying for substitutes; others, by personal service.    And an exercised municipal power of paying the former all their performance of their duty cost them, and paying the latter nothing, or paying the former more than the latter,— and a power of paying the former, exercised in some towns and not in others,—would not be a substantial or approximate equalization.

If the law had given every conscript a right of action against his town for a uniform sum, on a presumption (well or ill founded) that the amount of taxable property in each town is proportioned approximately, substantially, and with sufficient accuracy, to the number of militia residents; or if, to avoid the question of the constitutional justice of that presumption, or for any other reason, the law had given every conscript such a right of action against the state,—there would have been, among conscripts, and among towns, an equality not contemplated by the act of 1874.    The effect of that act, if it were valid, would be in some towns to pay, and in other towns not to pay, men who helped to fill the quotas by sending substitutes, and not to pay men who did as much to fill the same quotas by going themselves.

The federal duty of each conscript could be performed by himself in person, or by a substitute.    They whose wealth enabled them to perform the duty by substitutes were no more entitled than others to have it performed by substitutes furnished by the tax-papers.    The plaintiffs and others having been called out by the draft to perform their federal duty, they who by reason of poverty were able to perform their duty only by personal service were required to perform it in that way.    But the defendants' votes were, in effect, that the plaintiffs, who were able to perform their duty in both ways, should not be required to perform it in either way.    The claim of the plaintiffs to be practically exempted from the draft by being reimbursed the cost of their substitutes, while other conscripts, unable to incur such cost, are not exempted, presents one phase of the doctrine of unequal rights in a clear light.

It was not shown in *Bowles* v. *Landaff,* and it has not been shown in these cases, that there is any constitutional ground for a law in some towns leaving upon able-bodied men their share of the federal burden, and in other towns transferring from the able-bodied their share of the same burden to the tax-payers; pay-

ing some all the expense of performing their duty by substitute, and paying less or nothing to others who performed their duty themselves; authorizing towns, by reimbursing those who had been able to hire substitutes, practically to furnish substitutes for the rich, but not for the poor.

These cases do not bring in question a legislative power of requiring each town, as a part of the state, to raise their quota of men for the military or civil service of the state or the Union, as they are required to raise their quota of the state tax, and as they were required, by the act of June 27, 1780, to furnish their quota of beef cattle for the Continental army; or a power of ratifying unauthorized municipal action in local affairs; or a power of assuming or otherwise making an equal distribution of a non-local burden assumed by a town or by an individual.

The act of 1874 was such a provision for an unequal division of a non-local expense as would be made by an act authorizing towns to raise so much of the state tax as they pleased. The power of requiring the tax-payers of every town to pay their share of that tax, includes the power of authorizing them to pay it; but does not include a power of requiring one town to pay their share, and not requiring others to pay theirs, or authorizing one to pay their share, and authorizing others not to pay theirs. Their compulsory payment of their shares is not evidence of a municipal legislative right to withhold payment. The difference between a law that requires them all to perform a common and justly apportioned duty, and a law that submits to each the question whether they will perform their part or not, is the difference between equality and inequality. The principle of local self-government allows, between towns, much inequality of taxation for local purposes, but not for purposes not local. It permits towns to decide, within certain limits, how heavy their local burdens shall be, but not to decide whether they will bear their shares of the non-local burdens of the state.

If the federal service of the New Hampshire militia in the late war can be assumed as a public obligation of tax-payers, it can be assumed only as a common debt of all the tax-payers of the state. It is not a local debt, to be incurred at the option of municipal bodies exercising a power of local legislation. If it could be and were assumed as a public expense, and a common burden of all the tax-payers of the state, it could not be divided by local legislation compelling some of them to perform their duty, and releasing others without performance. The obligation of every member of the community to contribute his share of the public expense, is a part of the foundation which neither branch of the government is authorized to remove.

*Former order affirmed.*

FOSTER, BINGHAM, ALLEN, SMITH, and CLARK, JJ., concurred; STANLEY, J., concurred in the result.